WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States of America,

        Plaintiff,

v.

Gregory Dwayne Ramos,

        Defendant.

CR 21-01242-TUC-JCH (EJM)

**REPORT AND
RECOMMENDATION**

      Pending before the Court is the Defendant's Motion to Suppress Stop Based on Lack of Reasonable Suspicion to Conduct an Investigatory Stop.  (Doc. 40.) The defendant argues the evidence seized from his vehicle should be suppressed because the Border Patrol agents did not have reasonable suspicion to stop his vehicle.   The government concedes that there was not reasonable suspicion to stop the defendant's vehicle.  The government instead argues that the interaction between the agents and the defendant was a consensual encounter, not a stop, so reasonable suspicion was not required. (Doc. 42.)  For the reasons discussed below, the Court concludes that the government has not met its burden in proving that the agents did not stop the defendant's vehicle.  As a result, the lack of reasonable suspicion requires suppression of the evidence seized from the vehicle.

## FACTUAL BACKGROUND

      On May 4, 2021, the defendant was charged in a criminal complaint with Transportation of Illegal Aliens while placing the life of any person in jeopardy.  (Doc. 1.) This charge stemmed from the defendant's arrest the prior day.   On May 5, 2022, the defendant had his Initial Appearance and was released from custody to the supervision of

1    Pretrial Services.   On June 2, 2021, a federal grand jury in Tucson, Arizona returned a
2    three-count indictment charging the defendant with one count of Conspiracy to Transport
3    Illegal Aliens and two counts of Transportation of Illegal Aliens.  (Doc. 7.)

4    On February 23, 2022, the defendant filed the instant Motion to Suppress. (Doc.
5    40.)  The government filed a response on March 8, 2022. (Doc. 42.)  The Court set an
6    evidentiary hearing on the Motion to Suppress for March 29, 2022.  (Doc. 46.)  On March
7    21, 2022, defense counsel filed an unopposed Motion to Continue the Evidentiary Hearing
8    for 90 days.  (Doc. 49.)   The Court granted that motion and set an evidentiary hearing for
9    June 30, 2022.  (Doc. 52.)  The testimony and evidence presented at the evidentiary hearing
10   is set forth below.

11   **Border Patrol Agent Jeffery Brooks**

12   **1.  Direct Examination.**

13   Jeffery Brooks has been a Border Patrol Agent for 27 years.  Tr. 6/30/22 at 5.  He
14   has been assigned to the Casa Grande Border Patrol Station since 2004.  *Id.*  Agent Brooks
15   went through a five-and-a-half-month academy where he was instructed on different
16   aspects of the law, as well as "physical training, driving training, firearms training,
17   operational type training."  *Id.* at 6.  He is a certified driving instructor, is "ATV certified,"
18   and was a canine handler.  *Id.* at 5-6.  He has had "additional training through the
19   Department of Public Safety for commercial vehicle interdiction and inspections."  *Id.* at
20   6.  He had "a little bit of amount of training for Disrupt, which is an . . . anti-alien smuggling
21   group."  *Id.*  He has been a Field Training Officer since March, although he has held that
22   position numerous times during the course of his career.  *Id.*  As a Field Training Officer,
23   he instructs newer agents "on all aspects of the job that they'll encounter in the field," such
24   as field processing, searches, processing of people in the detention facility, area orientation,
25   and report writing.  *Id.* at 6-7.

26   The area of responsibility for the Casa Grande Station covers a large portion of the
27   Tohono O'odham Nation, including the City of Sells, Arizona, as well as parts of the Casa
28   Grande area.  *Id.* at 5, 7.  The City of Sells is roughly 28 miles north of the border.  *Id.* at

7.  The closet city to the east is Tucson, which is 40 miles from Sells.  *Id.*  Casa Grande is 65 miles to the north, and Why/Ajo is 60 miles to the west.  *Id.*  State Route 86 is the main highway that runs east and west through Sells.  *Id.*  Federal Route 15 runs north and south from State Route 86 to Case Grande.  *Id.* at 7-8.  Both State Route 86 and Federal Route 15 are two-lane paved roads with no shoulders.  *Id.* at 8.  There is a Border Patrol checkpoint on Federal Route 15 at mile marker 30.  *Id.*  There is another Border Patrol checkpoint on State Route 86 at approximately mile marker 146, which is east of Sells near Three Points at the edge of the Tohono O'odham Reservation.  *Id.* at 8-9.

The area around Sells is commonly used by smugglers to transport either undocumented individuals or drugs.  *Id.* at 9.  Federal Route 15 is also a common route that smugglers use even though there is a checkpoint on that road.  Agent Brooks explained that smugglers of undocumented individuals will circumvent the checkpoint by dropping people off at a village at mile marker 27 on Federal Route 15, and have the people "walk around the checkpoint and be picked up at a point north of the checkpoint."  *Id.*

On May 3, 2021, Agent Brooks was on duty from 6:00 a.m. until 4:00 p.m.  *Id.* at 10-11.  He was the Field Training Officer for three agents. *Id.* at 11. The trainees were riding with Agent Brooks in his marked Border Patrol Suburban.  *Id.*  At approximately 2:30 p.m., Agent Brooks and the trainees were observing traffic while positioned at the intersection of Main Street in Sells (which runs north/south) and State Route 86.  *Id.* at 11-12.  The Suburban was located north of State Route 86 and was facing southbound.  *Id.*

Agent Brooks observed a Nissan Sentra driving west on State Route 86 and began following the vehicle.  *Id.* at 15.  The driver was the only visible occupant and there were no vehicles between Agent Brooks and the Sentra.  *Id.*  After Agent Brooks got the license plate of the Sentra, he estimates that his vehicle was six or seven car lengths (probably a quarter of a mile) behind the Sentra. *Id.* at 15, 18.  Agent Brooks described the Sentra as "riding a little low on the rear end."  *Id.* at 15-16.  He explained that "riding low" means that "[w]hen there's excessive weight, the rear suspension will compress, so it rides at an angle where the rear end is lower than the front, which typically the vehicles are even, or

- 3 -

even a little tail high." *Id.* at 16.   In his experience, a vehicle that is riding low is a possible indicator of alien or drug smuggling.  *Id.* at 16-17.

Agent Brooks followed the Sentra for approximately 20 miles on State Route 86 before the Sentra turned northbound on Federal Route 15.  *Id.* at 18.  State Route 86 and Federal Route 15 form a T intersection; State Route 86 continues westbound and Federal Route 15 dead ends into State Route 86. *Id.* at 20.  During the time that Agent Brooks was following the Sentra on State Route 86, he never turned on the lights for his vehicle; he also did not turn on his siren or make hand gestures to get the attention of the driver.   *Id.* at 19.  After the Sentra turned onto Federal Route 15, Agent Brooks also turned onto that road and continued to follow the Sentra.  *Id.* at 19-20.  Agent Brooks explained that "at the turn," he was "fairly close" to the Sentra because the speed limit is reduced.  *Id.* at 20.  But he then "went back to maintaining about the quarter mile distance."  *Id.*

At mile marker 9 on Federal Route 15, which is 21 miles before the checkpoint, the Sentra turned right onto Federal Route 34.  *Id.* at 20-21.  Agent Brooks explained that there is "nothing" between mile marker 9 and the intersection of State Route 86 and Federal Route 15.  *Id.* at 21.  However, at mile marker 9 the Archie Hendricks Skilled Nursing Facility is to the east and is visible from Federal Route 15.  *Id.*  The nursing facility "deals with taking care of tribal members' health issues from that general area."  *Id.* at 21.  There are no other commercial properties in that area that are visible from Federal Route 15.  *Id.* at 22.  Federal Route 34 leads to that nursing facility, which is about 150 yards from the intersection of Federal Route 15 and Federal Route 34.  *Id.* at 21-22.

Agent Brooks followed the Sentra onto Federal Route 34.  *Id.* at 23-24.  When the Sentra "approached the western entrance to the Archie Hendricks Nursing Facility, the driver turned into the driveway."  *Id.* at 24.  The western entrance also leads to a residential area.  *Id.*   The Sentra pulled into a dirt lot south toward a single tree in the lot and parked nose in against a fence.  *Id.* at 25.  There were other vehicles in the lot.  *Id.*  Agent Brooks also drove into the dirt lot and parked "a little away from it."  *Id.*  Agent Brooks testified that his vehicle did not "in any way block the Sentra" and he was not "parked immediately

next to the Sentra." *Id.* at 26.

Before Agent Brooks was able to get out of his vehicle, the defendant "was already out of his vehicle walking." *Id.* Once Agent Brooks parked his vehicle, the trainees (who were wearing ballistic vests) exited the vehicle but stayed by the doors of the Suburban. *Id.* at 27. Agent Brooks described his initial interaction with the defendant as follows:

> At that time the driver exited his vehicle, started walking to the rear loading facility of the Archie Hendricks Center. I exited my vehicle, walked a few steps toward him, asked him, "hey, how's it going?" I believe he said something to the effect of "fine" or "good." I asked him where he was coming from today. California license plates on the vehicle. He said he was coming from San Antonio. I says, "why are you at the Archie Hendricks Facility?" He stated he was going to visit his grandmother who was being cared for there.

*Id.* at 25-26.

Agent Brooks was approximately ten feet from the driver when this conversation occurred. *Id.* at 28. He estimates that the trainees were 20 feet from the driver during the conversation. *Id.* at 69. Neither he nor the other agents drew their guns or made any commands to the driver. *Id.* at 28-29.

After the driver explained why he was at the facility, Agent Brooks asked him "if there were any people or narcotics in his vehicle." *Id.* at 31-32. The driver responded "[n]o." Agent Brooks then asked the driver whether it would "be okay if I look in your vehicle?" *Id.* at 32. The driver first said "[y]es," but "then almost immediately said no." *Id.* Agent Brooks was still ten feet away from the driver during this conversation and could not "see into the windows of his parked Sentra." *Id.* Agent Brooks told the driver that he "was going to go up and take a look into his vehicle" through the windows. *Id.* at 32-33. He let the driver know that he was going to walk to the vehicle for "[o]fficer safety, mostly." *Id.* at 33. The driver told Agent Brooks that he "could not do that" and then said that "there's people in the trunk." *Id.* The driver said he would open the trunk. *Id.* At that point, Agent Brooks and the trainees (who were still by the Suburban) walked to the trunk of the Sentra and found two people hiding in the trunk. *Id.* at 33-34. The agents then searched the rest of the Sentra and found three more people in the vehicle – two in the

backseat and one in the front passenger side floorboard – who were dressed in camouflage clothing and had backpacks. *Id.* at 34, 37.

Agent Brooks estimates that entire conversation with the driver lasted "probably three minutes" or "[m]aybe just a little longer." *Id.* at 33.   During this conversation, Agent Brooks never told the driver that he was not free to leave.  *Id.* at 34.   Agent Brooks also never "raised his voice" or "make any showing of force" towards the driver.  *Id.*

Agent Brooks testified that if the Sentra had "continued going north [on Federal Route 15] instead of turning onto Federal Route 34," it would have "eventually ended up at the checkpoint." *Id.* at 38.   During a normal shift, Agent Brooks would have travelled by the checkpoint on Federal Route 15 "[a]t least once southbound and once northbound." *Id.* at 39.  Agent Brooks testified that a shift change of agents was occurring at around 2:30 p.m. when he first encountered the driver. *Id.*   Agent Brooks identified Mr. Ramos as the driver of the Sentra on May 3, 2021.  *Id.*

### 2. Cross-Examination.

Agent Brooks agreed with defense counsel that his "function on that day was to train" the other agents.  *Id.* at 42.  At the Border Patrol academy, Agent Brooks was trained on the legal concepts of "probable cause" and "reasonable suspicion."  *Id.*  He agreed with counsel that he was trained and knows that there are "pieces of evidence to gather" that go into establishing reasonable suspicion.  *Id.*  He also agreed that he "knew what [he] could consider and what [he] could not consider" and that he could not "guess."  *Id.* at 42-43.

One of the trainees brought to his attention that the Sentra seemed "compressed," which means "[e]xcessive weight compressing the springs."  *Id.* at 43.   Agent Brooks decided to follow the Sentra because it seemed compressed.  *Id.* at 46.  Agent Brooks did not know the weight limit for the Sentra.  *Id.* at 52.  He agreed with counsel that the license plate "came back registered properly."  *Id.* at 46.  He also agreed that he followed the Sentra for about 30 miles.  *Id.* at 47.  The driver of the Sentra did not violate traffic rules during the 30 miles that he was being followed.  *Id.* at 47, 51. Because the window tinting was dark, Agent Brooks could not see if the driver was "holding his hands tightly on the steering

wheel" or "was constantly looking in his rearview mirror." *Id.* at 52-53.  When asked why he did not pull over the Sentra based on these facts, Agent Brooks testified as follows: "Based on my experience, when he went northbound on FR 15, he has two choices, one, to go to the immigration checkpoint or, [two], to pull off somewhere." *Id.* at 47.

Counsel asked Agent Brooks why he pulled into the dirt lot at the nursing facility, parked within ten feet of the Sentra, and began talking to the driver. *Id.* at 54. Agent Brooks testified that the Sentra was compressed, it had an out-of-state license plate (although he admitted that is not uncommon), and it pulled into the parking lot of a facility "which is tribal only." *Id.* at 54, 58.   Agent Brooks testified that he "did have some suspicion" that the Sentra was engaging in illegal activity, but he "did not have reasonable suspicion to make a vehicle stop at that time." *Id.* at 58.

Agent Brooks agreed with counsel that he singled out the Sentra.  *Id.* at 55-56. Agent Brooks did not discover a TECS hit for the Sentra. *Id.* at 57.  Agent Brooks testified that if the Sentra stopped on the side of the highway, he would have stopped as well "[t]o find out if everything is okay" because the Sentra had an out-of-state license plate so the driver could have been lost. *Id.* at 56.

### 3.   Redirect Examination.

Agent Brooks testified that he did not pull over the Sentra. *Id.* at 59.  He again testified that he did not pull behind the Sentra in the dirt lot; he pulled in near the Sentra. *Id.* at 60.  He did not block the Sentra's ability to drive away. *Id.* at 60.  Agent Brooks described his conversation with the driver as a "[c]asual conversation" that he initiated to "find out more information about what's happening." *Id.* at 60-61.  Up until the time that the defendant said he had people in the trunk of his vehicle, Agent Brooks did not have enough information to detain him. *Id.* at 61.   And he did not detain the defendant or "communicate to him that he was not free to leave" prior to learning there were people in the trunk of the Sentra. *Id.*

### 4.  The Court's Questions.

The Court asked Agent Brooks if the defendant walked towards him or the facility

(or both) when he exited the Sentra. *Id.* at 62. Agent Brooks testified that when the defendant got out of his vehicle, he "walked across the front of my vehicle, a little ways away from it, but across towards the facility." *Id.* He did not stop at the Suburban; "he kept walking." *Id.* Agent Brooks testified that the defendant would have been free to leave if he decided to do so after he was asked "how's it going?" *Id.* at 63.

## DISCUSSION

The Fourth Amendment prohibition against unreasonable searches and seizures extends to brief investigatory stops of persons or vehicles. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). "A person is seized when he is 'meant to be stopped by [a particular law enforcement action] . . . and [is] so stopped.'" *United States v. Al Nasser*, 555 F.3d 722, 731 (9th Cir. 2009) (*quoting Brendlin v. California*, 551 U.S. 249, 261 (2007)). "Usually the objective circumstances would prove a stop, but not always." *Al Nasser*, 555 F.3d at 726. The Supreme Court has rejected an inference that "an encounter is a seizure just because a reasonable person would not feel free to leave." *Id.* at 726. Therefore, the objective inquiry of whether a reasonable person would have believed he was not free to leave is supplemented with a requirement that a detention be "willful" because "the Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct.'" *Id.* at 728 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1988)). The purpose behind requiring "willful" governmental action is because "it does not make sense to blame an officer for interfering with someone's liberty when a person stops of his own accord, particularly when the officer did nothing to effect the stop and did not intend to stop him." *Id.* at 726.

In *Al Nasser*, the Ninth Circuit affirmed the district court's finding that Border Patrol agents did not stop the defendant's vehicle by shining a flashlight into his car as he drove by a scene where other cars were on the side of the road by the Border Patrol vehicles. *Id.* at 731. To support its conclusion that a stop did not occur, the Court noted that Border Patrol agents testified at the suppression hearing "that they did nothing to stop [the defendant's] car. Indeed, they did not want to have anything to do with [the defendant]."

*Id.* at 727.  The court specifically pointed to the following testimony of one agent:

> A: As he was passing by, I was thinking, "There goes another load of illegal aliens."
>
> Q:  So why not stop him?
>
> A:  We already had two vehicles stopped there, one with illegal aliens, one with alcohol, and I felt that was more than we could safely control at the time.

*Id.*

The court reasoned that although the defendant "might have thought that the five stopped vehicles and the Border Patrol agent in the road shining his flashlight were meant as a roadblock to stop all vehicles, they were not."  *Id.* at 731.  The court went on to note that "[i]n light of the district court's factual finding that the officers did not shout at [the defendant] to stop, the added detail of an officer standing in the road and shining a flashlight on passing vehicles does not suggest that the officers intended to stop [the defendant's] vehicle."  Because "there was no intentional government action directed at [the defendant] to bring about the stop of his vehicle, there could be no Fourth Amendment 'seizure.'"  *Id.*  Rather, the defendant's decision to stop was an "'accidental effect[] of otherwise lawful government conduct.'"  *Id.* at 732 (*quoting Brower*, 489 U.S. at 596).

In the case at hand, there are objective factors that would prove a stop.  They include: (1) Agent Brooks started following the defendant's car because the rear end was riding low or compressed, which raised a suspicion that the vehicle may contain contraband; (2) Agent Brooks followed the defendant for an incredibly long distance --  21 miles on State Route 86 and an additional 9 miles on Federal Route 15 -- apparently waiting for driving behavior and/or actions of the driver that would provide the needed reasonable suspicion to stop the vehicle; (3) Agent Brooks followed the defendant when he turned onto Federal Route 34 and then into the dirt lot; (4) Agent Brooks parked ten feet from the defendant's vehicle; (5) Agent Brooks and the three trainee agents, all of whom were armed (albeit without their weapons drawn), got out of the Border Patrol vehicle after the defendant exited his vehicle; (6) Agent Brooks initiated a conversation with the defendant as he was attempting to go

into the nursing facility; (7) that conversation included a question of whether the defendant had anything illegal in his car and a request to search the car; and (8) Agent Brooks advised the defendant that he was going to look in the defendant's car through the windows.

However, as the Ninth Circuit held in *Al Nasser*, objective facts that provide evidence "a reasonable person would have thought he was being stopped" are not always sufficient for a court to conclude that the police in fact stopped him. *Id.* at 726. A court must also examine whether the stop was "willful," meaning that law enforcement intended to stop him. *Id.* "[T]he law requires some blameworthiness in addition to 'cause in fact,' *i.e.*, mere consequence in a factual causal chain." *Id.* As in *Al Nasser*, the determination of "willful" behavior by Agent Brooks turns on his testimony.

In *Al Nasser*, the Border Patrol agents testified that they did not shout at the defendant to stop as he was approaching them. All they did was shine a flashlight at his car. And the agents provided an explanation of why they did not attempt to stop the defendant's car – *i.e.*, they wanted nothing to do with the defendant because they had their hands full with two vehicles they had stopped. This important factual detail is missing from Agent Brooks' testimony.

The Court first notes that, unlike the agents in *Al Nasser* who did not want anything to do with the defendant, Agent Brooks clearly did because he suspected the defendant was involved in illegal activity. Agent Brooks repeatedly testified that he did not stop the defendant's vehicle. However, that testimony is not factual, but rather a legal conclusion which this Court, not Agent Brooks, must make. Agent Brooks did testify that during the time that he followed the Sentra for 21 miles on State Route 86, he never turned on the lights for his vehicle; he also did not turn on his siren or make hand gestures to get the attention of the driver. However, Agent Brooks never testified that he also did none of those things on Federal Route 15, Federal Route 34, or prior to the defendant turning into the nursing facility. The absence of that evidence is fatal to the government's position that a stop did not occur.

The government bears the burden in proving that a stop did not occur. They have

not met their burden.  The only evidence that exists as to whether a stop occurred at Federal Route 34 and the entrance to the nursing center is the objective evidence detailed above which supports the defendant's argument that he was stopped by law enforcement.  As was the case on State Route 86, Agent Brooks may well not have turned on his lights or siren or made hand gestures to get the defendant to stop in the dirt parking lot for the nursing facility.  But that testimony needed to be elicited for this Court to conclude that Agent Brooks did not stop the defendant's vehicle.   Because it was not, the government has not proven that a stop did not occur.  And because the government concedes that there was not reasonable suspicion for a stop, the Court recommends that the motion to suppress evidence be granted.

## CONCLUSION

Because the government has not met its burden in proving that a stop did not occur, and the government concedes that there was not reasonable suspicion for a stop, the Court recommends that the District Court grant the motion to suppress and exclude the evidence obtained from the defendant's car.

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days.  No reply brief shall be filed on objections unless leave is granted by the district court. If any objections are filed, this action should be designated case number: CR 21-01242-TUC-JCH.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 25th day of July, 2022.

Eric J. Markovich
United States Magistrate Judge

- 11 -