**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-21-01242-001-TUC-JCH (EJM) |
| Plaintiff, | **ORDER** |
| v. | |
| Gregory Dwayne Ramos, | |
| Defendant. | |

Before the Court is the Magistrate Judge's Report and Recommendation ("R&R"), dated July 25, 2022. (Doc. 63.) The R&R recommends granting Defendant Gregory Dwayne Ramos' "Motion to Suppress Stop Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop" ("Motion"). (*Id.* at 11.) The Government objected to the R&R. (Doc. 64). The Court sustains the Government's objection, denies the Motion, and affirms the trial date.

**I.    Background**

On June 2, 2021, a grand jury returned a three-count indictment charging Defendant with Conspiracy to Transport Illegal Aliens (one count) and Transportation of Illegal Aliens (two counts) under 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), 1324(a)(1)(B)(i), and 1324(a)(1)(B)(ii). (Doc. 7.) On February 23, 2022, Defendant filed the Motion (Doc. 40); on June 30, 2022, Magistrate Judge Eric J. Markovich held an evidentiary hearing where he heard testimony from Border Patrol Agent Jefferey Brooks ("Agent Brooks"). (Doc. 63; H'rg Tr. at 5.)

**A. Facts**

The R&R accurately and thoroughly describes the facts and testimony. On May 3, 2021, U.S. Border Patrol agents arrested Defendant at the Archie Hendricks Skilled Nursing Facility ("Nursing Facility"), located near the intersection of Federal Route 15 and Federal Route 34 on the Tohono O'odham reservation. (Doc. 63 at 1–3; H'rg Tr. at 21.) Earlier that day, near Sells, Arizona, Agent Brooks and three agent trainees were observing traffic in a marked Border Patrol Suburban at the intersection of Main Street and State Route 86. (Doc. 63 at 2; H'rg Tr. at 11–12.) The R&R describes the events that followed:

> Agent Brooks observed a Nissan Sentra driving west on State Route 86 and began following the vehicle. [H'rg Tr. at 15.] The driver was the only visible occupant and there were no vehicles between Agent Brooks and the Sentra. *Id.* After Agent Brooks got the license plate of the Sentra, he estimates that his vehicle was six or seven car lengths (probably a quarter of a mile) behind the Sentra. *Id.* at 15, 18. Agent Brooks described the Sentra as "riding a little low on the rear end." *Id.* at 15-16. He explained that "riding low" means that "[w]hen there's excessive weight, the rear suspension will compress, so it rides at an angle where the rear end is lower than the front, which typically the vehicles are even, or even a little tail high." *Id.* at 16. In his experience, a vehicle that is riding low is a possible indicator of alien or drug smuggling. *Id.* at 16-17.
>
> Agent Brooks followed the Sentra for approximately 20 miles on State Route 86 before the Sentra turned northbound on Federal Route 15. *Id.* at 18. State Route 86 and Federal Route 15 form a T intersection; State Route 86 continues westbound and Federal Route 15 dead ends into State Route 86. *Id.* at 20. During the time that Agent Brooks was following the Sentra on State Route 86, he never turned on the lights for his vehicle; he also did not turn on his siren or make hand gestures to get the attention of the driver. *Id.* at 19. After the Sentra turned onto Federal Route 15, Agent Brooks also turned onto that road and continued to follow the Sentra. *Id.* at 19-20. Agent Brooks explained that "at the turn," he was "fairly close" to the Sentra because the speed limit is reduced. *Id.* at 20. But he then "went back to maintaining about the quarter mile distance." *Id.*
>
> At mile marker 9 on Federal Route 15, which is 21 miles before the checkpoint, the Sentra turned right onto Federal Route 34. *Id.* at 20-21. Agent Brooks explained that there is "nothing" between mile marker 9 and the intersection of State Route 86 and Federal Route 15. *Id.* at 21. However, at mile marker 9 the Archie Hendricks Skilled Nursing Facility is to the east and is visible from Federal Route 15. *Id.* The nursing facility "deals with

> taking care of tribal members' health issues from that general area." *Id.* at 21. There are no other commercial properties in that area that are visible from Federal Route 15. *Id.* at 22. Federal Route 34 leads to that nursing facility, which is about 150 yards from the intersection of Federal Route 15 and Federal Route 34. *Id.* at 21-22.
>
> Agent Brooks followed the Sentra onto Federal Route 34. *Id.* at 23-24. When the Sentra "approached the western entrance to the Archie Hendricks Nursing Facility, the driver turned into the driveway." *Id.* at 24. The western entrance also leads to a residential area. *Id.* The Sentra pulled into a dirt lot south toward a single tree in the lot and parked nose in against a fence. *Id.* at 25. There were other vehicles in the lot. *Id.* Agent Brooks also drove into the dirt lot and parked "a little away from it." *Id.* Agent Brooks testified that his vehicle did not "in any way block the Sentra" and he was not "parked immediately next to the Sentra." *Id.* at 26.
>
> Before Agent Brooks was able to get out of his vehicle, the defendant "was already out of his vehicle walking." *Id.* Once Agent Brooks parked his vehicle, the trainees (who were wearing ballistic vests) exited the vehicle but stayed by the doors of the Suburban. *Id.* at 27.

(Doc. 63 at 3–5.) Agent Brooks spoke to Defendant from about ten feet away. (Doc. 63 at 5; H'rg Tr. at 28.) During the conservation, the trainees were about 20 feet from Defendant. (Doc. 63 at 5; H'rg Tr. at 69.) Neither Agent Brooks nor the other agents drew their guns or made any commands to the driver. (Doc. 63 at 5; H'rg Tr. at 28-29.) There is no indication the three trainees did anything other than observe the encounter during this time. The R&R continues:

> After the driver explained why he was at the facility, Agent Brooks asked him "if there were any people or narcotics in his vehicle." *Id.* at 31-32. The driver responded "[n]o." Agent Brooks then asked the driver whether it would "be okay if I look in your vehicle?" *Id.* at 32. The driver first said "[y]es," but "then almost immediately said no." *Id.* Agent Brooks was still ten feet away from the driver during this conversation and could not "see into the windows of his parked Sentra." *Id.* Agent Brooks told the driver that he "was going to go up and take a look into his vehicle" through the windows. *Id.* at 32-33. He let the driver know that he was going to walk to the vehicle for "[o]fficer safety, mostly." *Id.* at 33. The driver told Agent Brooks that he "could not do that" and then said that "there's people in the trunk." *Id.* The driver said he would open the trunk. *Id.* At that point, Agent Brooks and the trainees (who were still by the Suburban) walked to the trunk of the Sentra

- 3 -

and found two people hiding in the trunk. *Id.* at 33-34. The agents then searched the rest of the Sentra and found three more people in the vehicle – two in the backseat and one in the front passenger side floorboard – who were dressed in camouflage clothing and had backpacks. *Id.* at 34, 37.

Agent Brooks estimates that entire conversation with the driver lasted "probably three minutes" or "[m]aybe just a little longer." *Id.* at 33. During this conversation, Agent Brooks never told the driver that he was not free to leave. *Id.* at 34. Agent Brooks also never "raised his voice" or "make any showing of force" towards the driver. *Id.*

Agent Brooks testified that if the Sentra had "continued going north [on Federal Route 15] instead of turning onto Federal Route 34," it would have "eventually ended up at the checkpoint." *Id.* at 38. During a normal shift, Agent Brooks would have travelled by the checkpoint on Federal Route 15 "[a]t least once southbound and once northbound." *Id.* at 39. Agent Brooks testified that a shift change of agents was occurring at around 2:30 p.m. when he first encountered the driver. *Id.* Agent Brooks identified Mr. Ramos as the driver of the Sentra on May 3, 2021. *Id.*

(Doc. 63 at 5–6.)

On cross-examination Agent Brooks acknowledged: (1) on May 3, 2021, his primary function was to train the trainees; (2) he ran the Sentra's license plate during the tail and found it was properly registered; (3) he followed the Sentra for nearly 30 miles before it stopped; and (4) he lacked reasonable suspicion to stop the Sentra. (H'rg Tr. at 42–58.)

### B. The R&R's Legal Analysis

The R&R rejected the Government's consensual encounter argument, finding "objective factors that would prove a stop." (*Id.* at 9.) The R&R identified the following facts as critical: (1) Agent Brooks followed Defendant's car because the rear end was riding low or compressed, which raised a suspicion that the vehicle contained contraband; (2) Agent Brooks followed the Defendant for 21 miles on State Route 86, and an additional 9 miles on Federal Route 15, apparently waiting for driving behavior and/or actions of the driver that would provide the needed reasonable suspicion to stop the vehicle; (3) Agent Brooks followed the Defendant onto Federal Route 34 and then into the Nursing Facility's dirt parking lot; (4) Agent Brooks parked ten feet from the Defendant's vehicle; (5) four agents, all of whom were armed (albeit without their weapons drawn), got out of the Border

- 4 -

Patrol vehicle after the Defendant exited his vehicle; (6) Agent Brooks initiated a conversation with the Defendant as he walked away towards the Nursing Facility; (7) the conversation included a question whether Defendant had anything illegal in his car and a request to search the car; and (8) after Defendant declined Agent Brooks' search request, he told Defendant that he was going to look in the Defendant's car through the windows. (*Id.* at 9–10.) The Court agrees the above facts occurred and are central to the analysis.

The R&R also found Agent Brooks' testimony lacked crucial details *to disprove* the encounter was an investigatory stop for which reasonable suspicious was required. More specifically, Agent Brooks' testified that he never turned on the overhead lights or siren and he did not make hand gestures directed at the driver while on State Route 86. (*Id.* at 10.) The R&R observed, "Agent Brooks never testified that he also did none of those things on Federal Route 15, Federal Route 34, or prior to the defendant turning into the [Nursing Facility]." (*Id.*) The R&R concluded the government failed to meet its burden disproving a stop and this was "fatal" to the government's argument that the encounter was consensual. (*Id.* at 11.) Accordingly, the R&R recommended the evidence obtained be suppressed under the exclusionary rule. (*Id.*) As explained below, the Court disagrees with the R&R on this point.

## II.    Legal Standards

### A.  Reviewing a Magistrate Judge's Report and Recommendation

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2005). Further, under 28 U.S.C. § 636(b)(1), if a party makes a timely objection to the magistrate judge's recommendation, then this Court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made."

### B.  Fourth Amendment and Consensual Stops

Under the Fourth Amendment, there are three types of stops by law enforcement. First, an officer may conduct a brief investigatory stop if justified by reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). Second, an officer may arrest an individual

if justified by probable cause. *See e.g., Adams v. Williams*, 405 U.S. 143, 148 (1972). Third, and relevant here, an officer may initiate a "consensual encounter" by approaching an individual to ask him or her questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (finding that "[M]ere police questioning does not constitute a seizure."). Such consensual encounters do not require any suspicion and do not constitute a seizure under the Fourth Amendment. *See Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993).

Whether an encounter is consensual is a fact-intensive inquiry. *See United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004). An encounter is consensual "[s]o long as a reasonable person would feel free to disregard the police and go about his business...." *Bostick*, 501 U.S. at 434. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may the Court conclude that a seizure has occurred. *Id.* (internal citation and quotation omitted). Thus, a consensual encounter evolves into an investigatory stop, requiring reasonable suspicion, if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Desyllas v. Bernstine*, 351 F.3d 934, 940 (9th Cir. 2003) (internal citation and quotation omitted); *see also United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001).

The Ninth Circuit has enumerated five factors that courts should consider in evaluating a consensual encounter: (1) the number of officers present; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter. *Washington*, 387 F.3d at 1068. These factors are not exhaustive, nor is any one factor determinative. *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004).

**III.  Analysis**

The Court will consider the events leading up to the arrest in sequence to determine whether Agent Brooks' interaction with Defendant at any point evolved from a consensual

encounter into a seizure under the Fourth Amendment.

### A. Agent Brooks Permissibly Followed Defendant for 30 Miles

An officer's decision to follow a motorist does not constitute a search or seizure within the meaning of the Fourth Amendment. *See, e.g., California v. Hodari D.*, 499 U.S. 621, 628 (1991) (finding a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject); *United States v. Santamaria–Hernandez*, 968 F.2d 980, 982–83 (9th Cir.1992) (finding a seizure does not occur when an officer turned on his overhead lights and sirens, but defendant failed to stop); *United States v. Coplen*, 541 F.2d 211, 214 (9th Cir. 1976), *cert. denied*, 429 U.S. 1073 (1977) ("It is well settled that visual observation by a law enforcement officer situated in a place where he has a right to be is not a search within the meaning of the fourth amendment.").

Here, the events occurred near the border with Mexico in an area known for alien smuggling with high Border Patrol presence. (Doc. 61 at 9–10.) From Sells, Arizona, both State Route 86 and Federal Route 15 lead to Border Patrol immigration checkpoints. (*Id.* at 8.) Agent Brooks observed Defendant's Sentra "riding low" in the rear and decided to follow. Agent Brooks followed Defendant for about 30 miles total. *See infra*, Part III.B. At some point, Agent Brooks ran the Sentra's license plate and determined the car's registration to be in order. (*Id.* at 19.) For the most part, Agent Brooks maintained his distance behind the Sentra at about six or seven car lengths. (H'rg Tr. at 15, 18.) Following the Sentra in this fashion did not constitute a seizure under the Fourth Amendment.

### B. Defendant Voluntarily Stopped the Sentra at the Nursing Home

When a driver stops his car voluntarily, and there is no overt government action directed at the defendant to make him stop his vehicle, no Fourth Amendment seizure occurs. *United States v. Judge*, 501 F.2d 1348, 1349 (9th Cir.1974) (finding no seizure when driver "stop[s] his car voluntarily and [the police] in no way ordered or requested him to do so"); *United States v. Summers*, 268 F.3d 683, 686–87 (9th Cir.2001) (finding constitutionally protected rights are not implicated when the encounter between a person

and a police offer is voluntary and the driver of the vehicle stopped on his own volition).

Here, Defendant turned off Federal Route 34 into the Nursing Facility, parked his car, got out, and walked towards the facility. The R&R makes a negative inference against the Government because Agent Brooks affirmatively stated he did not use his lights or sirens on State Route 86 but did not give similar testimony about his subsequent actions on Federal Routes 15 or 34. The R&R described this lack of affirmative testimony as "fatal" to the Government's position. (Doc. 63 at 10–11.)

The Court disagrees with the R&R on this point. The record is beyond reasonable dispute that Agent Brooks did not use his lights or siren to signal Defendant to stop his vehicle. Agent Brooks was asked by defense counsel, "do you agree that you pulled Mr. Ramos over?" and he responded, "I did not pull him over." (H'rg Tr. at 59.) On cross examination, Defendant had the opportunity to clarify the record or illicit testimony that Agent Brooks had used his lights or siren. Defendant's own words at the time of his arrest indicate that he stopped his car voluntarily to go to the Nursing Facility. (H'rg Tr. at 26–26) ("[Defendant] stated he was going to visit his grandmother who was being cared for [at the Nursing Facility]."). And, ultimately, Defendant never argued Agent Brooks had used his lights or siren to stop Defendant. The Court finds that at no point did Agent Brooks direct or signal Defendant to stop the Sentra and, therefore, Defendant voluntarily stopped in the parking lot at the Nursing Facility.

**C. Agent Brooks' Questioning Was Appropriate**

Police questioning is unlikely to result in a Fourth Amendment violation. *Delgado*, 466 U.S. at 216 (explaining that, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response"); *Bostick*, 501 U.S. at 434–435 ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; [] provided they do not convey a message that compliance with their request is required.") (citation omitted).

The way Agent Brooks questioned Defendant would not have led a reasonable person to believe that he was not free to refuse Agent Brooks or to leave. Agent Brooks parked his Border Patrol vehicle ten feet from Defendant's Sentra in a public setting; the Border Patrol vehicle did not block the Sentra. Agent Brooks approached Defendant and initiated a conversation from about ten feet, while the three trainees stood about 20 feet away watching from next to the Border Patrol vehicle. Only Agent Brooks conversed with Defendant, and he did not request Defendant's driver's license or vehicle registration. All four agents were armed, but their weapons were holstered, and the agents did nothing to draw additional attention to their weapons. No evidence suggests Agent Brooks, or any trainee, blocked or hampered Defendant as he walked away from his vehicle toward the Nursing Facility.

Similarly, the content of Agent Brooks' questions would not have led a reasonable person to believe that he was not free to refuse Agent Brooks or to leave. Agent Brooks described his interaction with the Defendant:

> At that time the driver exited his vehicle, started walking to the rear loading facility of the Archie Hendricks Center. I exited my vehicle, walked a few steps toward him, asked him, "hey, how's it going?" I believe he said something to the effect of "fine" or "good." I asked him where he was coming from today. California license plates on the vehicle. He said he was coming from San Antonio. I says, "why are you at the Archie Hendricks Facility?" He stated he was going to visit his grandmother who was being cared for there.

(H'rg Tr. at 25–26.) Agent Brooks asked whether there were any people or narcotics in the Sentra, and Defendant answered "no." Agent Brooks next asked whether it would be okay if he looked inside the Sentra. At first Defendant agreed, but then withdrew his consent. Defendant's statement shows that, at the time, Defendant felt free to refuse a search. Then Agent Brooks indicated that he was going to look inside the Sentra's windows, and he moved toward the Sentra. (H'rg Tr. at 31–33.)

Agent Brooks' statement that he was going to look through the Sentra's windows did not amount to a seizure or cross any Constitutional line. As the Government correctly

- 9 -

notes, the reasonableness standard presupposes an *innocent* person. *Bostick*, 501 U.S. at 438. Moreover, the Court does not view Defendant's revocation as supporting coercion. Agent Brooks merely stated an intent to do something—look into a car parked in a public setting—an act he could perform whether the Defendant provided permission or not. *See United States v. Orozco*, 590 F.2d 789, 792 (9th Cir. 1979) (finding no Fourth Amendment search when law enforcement looked through the car windows of a vehicle parked on a public street). Defendant could have chosen to ignore Agent Brooks, instead, before Agent Brooks reached the Sentra and inevitably saw the three aliens hiding on the floor inside, Defendant volunteered there were people in the trunk and offered to open the trunk. *See Fla. v. Royer*, 460 U.S. 491, 519, n. 4 (Blackmun, J., dissenting) ("The fact that [respondent] knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position"). "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984); *see also Bostick*, 501 U.S. at 438 (explaining that the "reasonable person" test presupposes an innocent person). The substance, manner, and length of Agent Brooks' conversation with Defendant did not improperly convey that Defendant was required to comply.

### D.  The Totality of the Circumstances and the *Washington* Factors

The Court has considered the totality of the circumstances with special focus on the *Washington* Factors. Only two of five Washington Factors favor Defendant: 1) the number of agents present (four) during the encounter; and 2) that the agents never told Defendant he was free to leave. On balance, the Court finds the encounter between Agent Brooks and Defendant was consensual and never evolved into a seizure under the Fourth Amendment.

Two cases – *United States v. Judge*, 501 F.2d 1348 (9th Cir. 1974) and *United States v. Chan–Jimenez*, 125 F.3d 1324 (9th Cir. 1997) – are particularly instructive here. In *Judge*, a uniformed Border Patrol agent followed a truck that he suspected was smuggling

aliens but lacked articulable facts to justify a stop. 501 F.2d at 1348–49. The agent followed the truck in his marked car, and eventually the truck pulled into a parking lot without any prompting by the agent. *Id.* at 1349. The agent walked towards the driver and the driver initiated a conversation with the agent. After a conversation lasting several minutes, the agent asked to inspect the truck. *Id.* The driver agreed, and a subsequent search revealed 1,100 pounds of marijuana. *Id.* The Ninth Circuit found Judge stopped his car voluntary and concluded that defendant's subsequent actions also supported voluntariness: *Judge* initiated a conversation with the agent, he readily agreed to a search, and he unlocked the truck's back cover himself. *Id.*

In contrast to *Judge*, in *Chan-Jiminez*, a tribal police officer in an unmarked vehicle followed a pickup truck for a mile and a half. *Chan–Jimenez*, 125 F.3d at 1325. The officer ran a check on the truck's license plates because he "felt that this vehicle [contained] contraband." *Id.* The truck pulled over on the highway and the driver and a passenger got out and opened the hood of the truck. *Id.* The officer pulled in behind the truck, "activated his emergency lights," and identified himself as an officer to the truck's occupants. *Id.* The officer requested the driver's license and the vehicle registration, both of which were provided and found to be "in order." *Id.* The officer nevertheless retained the license and registration and asked for permission to search the truck. *Id.* Throughout the encounter, the officer kept his hand on his revolver which the Court characterized as, "possibly a desirable safety measure, but one that also let Chan–Jimenez know that there could be adverse consequences for any failure to submit to authority." *Id.* The Ninth Circuit found that a seizure occurred when the officer did not return the license and registration after determining they were in order. *Id.* at 1326 (finding "[a] reasonable person in Chan–Jimenez's position would not have felt free to leave or to ignore the officer's presence and go about his business.").

Here, the facts and circumstances are much closer to *Judge*. The facts are arguably distinct from *Judge* in two significant ways: (1) Agent Brooks followed Defendant's Sentra for nearly 30 miles; and (2) four armed agents were present during the encounter in the

Nursing Facility parking lot. *See* 501 F.2d at 1348–50. But these two distinctions are not enough to tip the scales in Defendant's favor given the totality of the circumstances and the other three *Washington* factors that weigh in the Government's favor. Also, this case is distinguishable from *Chan-Jimenez* because Agent Brooks did not prevent Defendant from leaving by taking and holding his driver's license and registration. A reasonable and innocent person in Defendant's position would have felt free to ignore Agent Brooks and leave. The encounter was consensual and never evolved into a Fourth Amendment seizure. The Government's objection to the R&R is sustained.

### E. If the Court Had Found an Illegal Seizure, It Would Not Have Applied the Exclusionary Rule

The "exclusionary rule" prohibits evidence obtained through an illegal search or seizure, *Stone v. Powell*, and is a remedy to be used as a last resort, *Hudson v. Michigan*. 429 U.S. 465, 481-87 (1976); 547 U.S. 586, 591 (2006). To trigger the exclusionary rule, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Herring*, 555 U.S. 135, 144 (2009).

Even if the Court had found an illegal search, the conduct presented here is not "sufficiently culpable" to warrant suppression. The Court is not concerned by Agent Brooks following the Defendant for about 30 miles. Agent Brooks testified this is an area commonly used by smugglers to transport undocumented aliens. (H'rg Tr. at 9.) A "common trend" used to circumvent Border Patrol checkpoints is to "stop near that village [located at mile marker 27 on Federal Route 15] and offload the … undocumented aliens to walk around the checkpoint and be picked up at a point north of the checkpoint." (H'rg Tr. at 9.) When a Border Patrol agent suspects a vehicle might be transporting undocumented aliens, it is a legitimate law enforcement tactic to follow that vehicle until it reaches a Border Patrol checkpoint. Given the vast distances involved in Southern Arizona that will sometimes mean following a vehicle for 30 miles or more. Here, if Defendant continued driving north on Federal Route 15, he would have eventually reached

a checkpoint. (H'rg Tr. at 38–39.) Based on his training and experience, Agent Brooks followed Defendant when he turned onto Federal Route 34, seemingly to avoid the checkpoint at Federal Route 15.

The Court recognizes that a reasonable person might feel intimidated by the presence of four Border Patrol agents. That fact, more than any other, makes this case a close one. But four agents were present only because Agent Brooks had three trainees in his vehicle. The three trainees were not present to intimidate or frighten anyone, but to observe, and that is all they did. Thus, even if the Court had found a constitutional violation, the Court would not have applied the exclusionary rule because the Border Patrol agents in this case did nothing that the Court would want to discourage other Border Patrol agents from doing in the future.

**IV.   Order**

Accordingly,

**IT IS HEREBY ORDERED REJECTING** the Report and Recommendation (Doc. 63.)

**IT IS FUTHER ORDERED DENYING** Defendant's Motion to Suppress Stop Based on Lack of Reasonable Suspicion to Conduct Investigatory Stop (Doc. 40).

**IT IS FUTHER ORDERED AFFIRMING** the trial date set to begin **November 1, 2022**, at **9:30 a.m.**

Dated this 14th day of September, 2022.

_____
Honorable John C. Hinderaker
United States District Judge